Pamela K. Fulmer (SBN 154736)
Email: pam@tacticallawgroup.com
Dee A. Ware (SBN 154549)
Email: dware@tacticallawgroup.com
Tactical Law Group LLP
4000 MacArthur Boulevard, Suite 600
Newport Beach, California, 92660
Telephone: (949) 991-1898

Mark J. Arnot (NY SBN 4736591)
Email: mark@arnotlaw.com
Arnot Law
2430 Glasco Turnpike
Woodstock, NY 12498
Telephone: (646) 926-6149
Pro Hac Vice Application to Be Submitted

Attorneys for Plaintiff DK LAW –
INJURY, ACCIDENT AND MORE, PC
f/k/a THE LAW OFFICES OF DANIEL
KIM, CORPORATION

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| DK LAW - Injury, Accident, and More, PC, a California professional corporation;<br><br>Plaintiff,<br><br>vs.<br><br>CONNEX ONE LIMITED, a United Kingdom corporation; CONNEX ONE INC., a Delaware corporation; and Does 1 through 50,<br><br>Defendants. | Case No. 8:26-cv-01021<br><br>**COMPLAINT FOR FRAUD IN THE INDUCEMENT, PROMISSORY FRAUD, NEGLIGENT MISREPRESENTATION, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, DECEPTIVE ACTS AND PRACTICES UNDER N.Y. GEN. BUS. LAW § 349, UNFAIR BUSINESS PRACTICES UNDER CAL. BUS. & PROF. CODE §§17200 AND 17500, AND DECLARATORY RELIEF** |

Plaintiff DK Law - Injury, Accident, and More, PC, formerly known as The Law Offices of Daniel Kim, Corporation ("DK Law" or "Plaintiff"), hereby

---

complains against Defendants Connex One Limited ("CO Ltd."), Connex One Inc. ("COI") (collectively "Connex"), and Does 1-50, inclusive (collectively "Defendants"), as follows:

## INTRODUCTION

1.      Having a reliable phone system is essential for a thriving personal injury law firm, and more high volume firms are turning to AI software for data analytics and to improve existing and potential client experiences. Plaintiff DK Law is such a firm. When its telephone system fails, DK Law cannot operate effectively and serve its clients. And, of course, it also loses potential new business.

2.      In the Fall of 2024, DK Law met with Connex about its telephone services and Omnichannel System & Athena 2.0 software. To induce DK Law to enter into the contract, Connex made numerous representations. including but not limited to promises concerning its 24/7 customer support, an already-existing system that could be customized within a week to meet DK Law's needs, AI analysis and reporting, call routing, recording, transcription and translation capabilities, and reliable telephone service, all of which proved to be untrue. Instead, what DK Law got after it signed Defendant Connex's Quotation Form and Master Terms (the "Contract") was a system that took months to configure, frequently went down, dropped and misrouted calls, had problems with Bluetooth headset connectivity, failed to record complete conversations, inaccurately transcribed calls in English and could not transcribe or provide sentiment analysis for calls in Spanish at all, and was unable to generate the promised AI assessments and automated reports.  Connex would sometimes claim to "fix" reported problems only for them to reoccur shortly thereafter. On other occasions, DK Law's service requests were ignored altogether.

3.      By July 2025, DK Law had had enough and notified Connex that it would not renew its contract at the end of the one-year term. Defendant Connex's

response was to ignore the notice of nonrenewal, claiming that it was ineffective because it was not given with sufficient advance notice pursuant to the Contract. What the Defendant did not mention is that New York law required Connex to give written notice of the automatic renewal in advance. Having failed to do so, the Contract's automatic renewal provision was ineffective. Specifically, New York General Obligations Law § 5-903 ("Section 5-903") governs automatic renewal provisions in contracts for service (including telecommunications and software), maintenance, or repair to or for any real or personal property (including both tangible and intellectual property, such as software). The statute provides that such autorenewal provisions are unenforceable against the person receiving the service unless the person furnishing the service gives written notice, served personally or by certified mail, calling attention to the existence of the automatic renewal clause at least fifteen days and not more than thirty days before the time specified for serving notice of termination.  Defendant Connex never provided the requisite notice of automatic renewal to Plaintiff. On information and belief, Connex includes the automatic renewal provision because it knows that its product and services are defective and that customers will not renew otherwise.

4.     DK Law is informed and believes, based on Connex's standardized sales materials, the repeated use of the same functionality claims in its marketing deck, and Connex's insistence on enforcing automatic renewals notwithstanding its position that Section 5-903 does not apply, that Connex employs materially similar sales and renewal practices with multiple customers. On information and belief, other companies have also been damaged by this deceptive practice and flagrant violation of New York law.

5.     Instead of conceding its failure to give proper notice, Connex took the position that Section 5-903 did not apply to it and embarked on a campaign to stiff arm DK Law into a renewal. Connex did so by showing up uninvited at DK Law's office and harassing its employees, repeatedly calling and texting DK Law's Chief

Technology Officer, offering as a carrot unsolicited, and presumably desirable, trips to company facilities and discounts, on the one hand, and then applying the stick by threatening litigation on the other.  Connex also continued to invoice DK Law after the end of the contract term and threatened to send DK Law to collection if Connex's invoices for the renewal were not paid.

6. To add insult to injury, as the end of the Contract term approached, Plaintiff reached out repeatedly to Connex to get PINs needed to port its telephone numbers to another provider. Connex ignored the requests, refusing to facilitate the timely porting of the numbers in violation of the Communications Act and FCC rules.

7. DK Law seeks to rescind the Contract that it was fraudulently induced to enter into, and seeks restitution and damages, including punitive damages, to compensate it for the harm caused by Connex's unfair and deceptive business practices, and to punish Connex for its fraud in the inducement and other unlawful conduct.

8. Plaintiff further brings this action seeking restitution of monies paid under the Contract to Connex, as well as other damages suffered by DK Law due to Defendants' breaches of contract, including but not limited to lost referral and other business, inability to manage cases at times due to the phones and AI software not working, and additional costs and damages in an amount to be proven at trial.  Plaintiff also seeks an injunction against Defendant under New York General Business Law § 349 and California's Unfair Competition Law, which is necessary to prevent Defendant from defrauding and cheating other customers, damages, and attorneys' fees. Finally, DK Law seeks a declaration that (1) the Contract should be completely rescinded due to Connex's fraud in the inducement; and (2) if not rescinded, that Connex violated Section 5-903 and the Contract did not renew.

**<u>JURISDICTION AND VENUE</u>**

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship between the parties. Plaintiff DK Law is incorporated and headquartered in California. On information and belief, Defendant CO Ltd. is incorporated in the United Kingdom with its principal place of business in Manchester, England. On information and belief, Defendant COI is incorporated in Delaware and has its principal place of business in Newark, Delaware, Miami, Florida or Manchester, England. On information and belief, Defendants, and each of them, are doing business in the District and are subject to personal jurisdiction here. The amount in controversy alleged herein exceeds $75,000.

10.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to DK Law's claims occurred in this District. Defendants marketed, negotiated, sold, implemented, supported, billed, and directed collection activities toward DK Law in California; the Connex system was implemented for and used by DK Law at its Costa Mesa headquarters; the service failures, failed implementation, porting delays, and business injuries were experienced by DK Law in this District; and DK Law's notice of nonrenewal and transition to a replacement provider occurred from this District.

## THE PARTIES

11.      Plaintiff DK Law, formerly known as The Law Offices of Daniel Kim, Corporation, is a California-based personal injury law firm. DK Law is a professional corporation organized and existing under the laws of the State of California with its headquarters located in Costa Mesa, California.

12.      Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned herein, Defendant CO Ltd. is and was a corporation organized and existing under the laws of the United Kingdom. On information and belief, CO Ltd.'s headquarters are located in Manchester, England. Defendant CO Ltd.,

COMPLAINT                                                                    CASE NO. 8:26-cv-01021

5

and certain of its related companies, develop, provide, and manage telecommunications services and software products.

13. Plaintiff is informed and believes that Defendant CO Ltd. directly participated in the sales process, provided or controlled implementation and support personnel, and directed or ratified the post-notice renewal and retention conduct described below. Plaintiff further alleges that CO Ltd. personnel communicated with DK Law during pre-contract negotiations, implementation, and the post-notice dispute, and that CO Ltd. exercised direct control over the conduct giving rise to the tort and statutory claims asserted herein.

14. Plaintiff is informed and believes, and thereon alleges, that, at all times mentioned herein Defendant COI is and was a corporation organized and existing under the laws of the State of Delaware, with its headquarters located in Newark, Delaware, and registered to do business in California. On information and belief, COI is wholly owned and operated by CO Ltd.

15. Plaintiff does not know the true names and capacities, whether individual, corporate, or otherwise, of the Defendants named herein as Does 1-50, inclusive. Plaintiff therefore sues these Defendants by fictitious names. Plaintiff will amend this Complaint to reflect the Doe Defendants' true names and capacities when they have been ascertained by inserting their true names and capacities in place of the fictitious names in accordance with the Federal Rules of Civil Procedure and any applicable state law. Plaintiff is informed and believes, and thereon alleges, that whatever and wherever in this Complaint any of the Defendants are the subject of any charging allegations by Plaintiff, that Doe 1 through Doe 50 are also responsible in some manner for the events and happenings alleged herein, and it shall be deemed that such Doe Defendants, and each of them, are likewise the subject of DK Law's charging allegations herein.

16. DK Law is informed and believes that COI acted as the United States contracting arm, agent, instrumentality, or alter ego of CO Ltd. with respect to the

transactions and misconduct alleged herein. CO Ltd. controlled or directed the sales, marketing, implementation, support, retention, billing, renewal-enforcement, and number-porting conduct alleged in this Complaint; CO Ltd. and COI used common Connex/ConnexAI branding, common marketing materials, common customer-facing communications, common personnel or operational infrastructure, and common sales and support systems; and CO Ltd. directed, ratified, or benefited from COI's conduct.

17.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, Defendants, whether sued by their true names, or as a Doe, were the principal, agent, servant, joint-venture, partner, parent, subsidiary, trustee, employee or director of each other Defendant, and acted within the course and scope of that relationship and/or were the legal alter ego of each other Defendant, having so dominated and controlled them to the point where their identities were no longer separate and it would be unfair and inequitable to treat them separately.

18.     At all relevant times, each Defendant was and is the agent of each of the remaining Defendants and, in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

## **GENERAL ALLEGATIONS**

### **DK Decides to Seek an Integrated Telephone Platform**

19.     Connex is a telecommunications and software company, providing services such as Outbound Traffic Routing, Inbound Traffic Routing and outbound dialing to fixed and mobile telephone numbers, SMS, social media, and call recording, as well as supplying software products, including Athena AI.

20.     Prior to being introduced to Connex, DK Law was using Nextiva. Although it was satisfied with the telephone services that Nextiva provided, DK

COMPLAINT                                                                CASE NO. 8:26-cv-01021

Law decided to search for a more robust telephone platform with AI integration, call metrics and enhanced analytics regarding client and prospective client interactions, dashboards, and a WhatsApp integration.

21.    In or about September 2024, Donna Axalan, DK Law's Chief Innovation Officer, reached out to Connex because it was the only telephone service provider that DK Law was aware of at the time advertising its WhatsApp integration capabilities.

### Connex's Pre-Contract Representations

22.    On or about September 30, 2024, Jake Lynn, on behalf of Defendants, emailed Donna Axalan at DK Law to schedule a meeting to demo Connex's products and forwarded a 68-slide PowerPoint marketing its services. A true and correct copy of the PowerPoint is attached hereto as Exhibit 1.

23.    On or about October 3, 2024, Ms. Axalan met with Connex via Google Meet for a demo.

24.    Mr. Lynn and other members of his team touted Connex's high level of customer service, which was marketed in the demo as follows: "Customer Experience is at the core of what we do. Our continued high-touch service ensures you're never left to figure it out alone and promises to minimize downtime and disruption to your business with effective change management and support strategies" and that its "inhouse team are on hand 24/7 whenever you need them" "ensuring that . . . operations continue without disruption."  Exh. 1, slides 4 and 61.

25.    While Connex represented that its services were available out of the box, it stressed that it would further customize its services to meet DK Law's needs, stating that "Our Account Management teams get to know your business and tailor our services to help you meet your goals."  Exh. 1, slide 4. Connex represented that native to the Omnichannel System was phone and voice services,

inbound and outbound communication, webforms, live chat, email, social media, SMS & WhatsApp integration, API logging and integration, and PCI DSS/payment IVR and that these existing native functionalities integrated seamlessly with DK Law's CRM systems. Connex also represented that its Athena software included sentiment analysis, entity recognition, call transcripts, whisper coaching, interaction clustering, training cues, ability to identify trends and Athena flows. Exh. 1, slides 5 and 37. Connex further represented that all of these native features would be configured to meet DK Law's needs within a week. Exh. 1, slides 6 and 60. In actuality, it took approximately three months for Connex to begin rollout, with significant unresolved configuration issues.

26.    On information and belief, Connex provides misleading demos to its prospective customers falsely representing that such technology currently exists and can be rolled out quickly with full functionality. This is done in order to deceive the customer about the services that Connex is actually able to provide in order to close the sale.

27.    In its demo, Connex represented that the Athena AI software included AI Agent, AI Guru, AI Analytics, AI Voice, Automatic Speech Recognition ("ASR"), all of which were represented to elevate customer interactions and enhance customer engagement and experience. Exh. 1, slides 8 and 9.

28.    Connex pitched its AI Agent as the perfect solution for DK Law, offering 24/7 availability; faster response times and personalized interactions, boosting customer satisfaction; human-like voice and text-based communication, "setting a new standard beyond traditional chatbots and driving unparalleled business success;" scalable and capable of handling 50x more interactions using a trained model without compromising on quality or response times; cost efficiency; automation of repetitive and routine tasks, such as authentication, appointment booking, payment processing, FAQ responses, etc. with 24/7 support; enhanced compliance with regulatory disclosures and compliance requirements; delivery of

a consistent and standardized experience to every customer, ensuring that all enquiries are handled with the same level of accuracy and professionalism; and optimization of interaction management. Exh. 1, slides 11-17 and 56. These representations turned out to be false.

29.　The most attractive feature of AI Guru to DK Law was what Connex labeled "Dynamic Guidance in Real-Time," which was real-time call transcripts of customer interactions, "facilitating swift analysis and issue resolution." Exh. 1, slides 19 and 26. Connex assured DK that the transcription service was available for calls conducted in English and Spanish. Likewise, the AI Voice component of Connex's Athena software purportedly had multilanguage capabilities, allowing the AI Agent to communicate with customers in many languages. Exh. 1, slides 33 and 35.

30.　Connex also promoted the AI Analytics component of its software, which would provide DK Law with "rapid access to insights and reports." Exh. 1, slides 25 and 27.

31.　Further, Connex told DK Law that, with its ASR, Connex would "never miss a word" of caller interactions with the AI software, and calls would be routed to the correct person or department at DK Law. Exh. 1, slides 34-35, 37-39 and 41.

32.　The representations that Connex made to DK Law in the PowerPoint and pre-contract meeting with Ms. Axalan were not isolated sales statements. Connex made substantially the same representations, in substantially the same language, across its public website during the preceding weeks and months. Archived captures of those pages establish that the misrepresentations at the heart of this Complaint were Connex's standard, consistent, and public sales pitch.

33.　For example, on or about July 11, 2024, Connex published on its Athena AI product page that its "Automatic Speech Recognition" technology would allow users to "Never miss a word." Connex further represented on that

page that its "AI Agent" product would "handle both complex inbound and outbound enquiries, and provide instant, round-the-clock support across voice and digital channels"; that its "AI Guru" would deliver "instant access to practical knowledge, advanced conversational capabilities, and unparalleled support"; that its "AI Analytics" would provide "insights on sentiment, key phrases, and data capture, enabling informed decisions"; and that its "AI Voice" product offered "sophisticated linguistic programming tailored to your brand's tone of voice, formality, and language requirements," with Text-to-Speech (TTS) and Speech-to-Text (STT) solutions that "seamlessly integrate with your business." A true and correct copy of the July 11, 2024 archived capture of that page is attached hereto as Exhibit 2.

34.    On the same Athena AI page, Connex represented to the public, as dated performance claims, that its platform delivered a "133% Increase in workforce productivity," a "60% Average increase in sales," that "99% Of our clients would recommend us," and a "36% Increase in CSAT scores." Connex further assured prospective customers: "We're so confident your team and your customers will love our Athena AI solution as well as the quick set up, and rapid time to value." Exh. 2.

35.    On or about July 13, 2024, Connex published on its U.S. homepage the representation that its "Athena" platform was "The Leading Conversational LLM — the cutting-edge generative AI solution transforming customer interactions with seamless, conversational intelligence across voice and digital channels." Connex further represented that the platform had processed "4 Billion+ Transactions" per year and published the same performance metrics identified in the preceding paragraph. Connex included on that homepage a dedicated section titled "AI Technology You Can Trust," in which it represented: "Nothing is more important than uptime and security measures. Connex is subjected to rigorous auditing to ensure high standards of security and robust data protection controls."

A true and correct copy of the July 13, 2024 archived capture of that homepage is attached hereto as Exhibit 3.

36.   On or about July 16, 2024, Connex published on its Omnichannel Software page representations that its "Flow" workflow automation tool would enable customers to "orchestrate comprehensive omnichannel customer journeys" with rules that would "automate the entire process, thereby reducing wait times and enhancing the overall efficiency of interactions." Connex represented that its platform included "AI interaction analytics tools" for "Keyphrase Analysis and Entity Recognition" and "AI Sentiment Analysis" that would "gauge [customer] level of satisfaction and engagement." A true and correct copy of that archived page is attached hereto as Exhibit 4.

37.   At its software.connexone.io platform landing page, captured by the Wayback Machine repeatedly since on or about July 16, 2022 and continuously through at least January 18, 2025, Connex prominently represented: "Transform your performance in days with contact center AI" and "Connex AI: the all-in-one platform to empower your agents, boost revenue, drive customer engagement & minimize business costs," coupled with three specific commitments — "Free set-up & training," "Fast go-live," and "Free 24/7 support." A true and correct copy of the archived capture of that page closest in time to the relevant contract execution is attached hereto as Exhibit 5.

38.   On or about August 5, 2024, on its Call Center Software page, Connex represented, among other things, that its call center software provided "24/7 Availability"; "intelligent call routing"; "real-time call monitoring"; "reporting functionalities [that] leverage historical data to provide insights"; and a "comprehensive suite of features encompassing both inbound and outbound capabilities." A true and correct copy of that archived page is attached hereto as Exhibit 6.

39.   Connex also markets directly to law firms, and specifically to personal

injury law firms like DK Law. On its website at https://connex.ai/us/resources/optimizing-legal-intake-agentic-ai-for-client-onboarding, Connex publishes an article titled "Optimizing Legal Intake: Agentic AI for Client Onboarding," which dedicates a "Use Case: Motor Vehicle Accident Intake with Agentic AI" section promising that Connex's AI agent answers personal-injury accident calls "immediately" with a "warm, professional greeting," "conducts a conversational assessment of the accident circumstances," "performs an immediate conflict check," "creates a complete case record" in the firm's practice management system, "emails the client a retainer agreement for e-signature," and assigns the case "to the appropriate attorney on your personal injury team." The same article includes a "Case Study: AI-Powered Intake for a Personal Injury Firm" describing an unnamed "leading personal injury law firm based in California, which has recovered millions of dollars for clients since 2010," and claims that Connex's platform delivered a "30% increase in net conversion rate" and "24/7 intake capability capturing time-sensitive accident cases," accompanied by a quotation attributed to "the firm's CTO." A true and correct copy of the article is attached hereto as Exhibit 7.

40.   The representations set forth above and in Exhibits 1–7 were false or were made with reckless disregard of their truth. As DK Law's experience demonstrates, Connex's telephone system did not deliver reliable, 24/7 service; its AI did not "perform conflict checks in real-time," "create a complete case record," or route calls reliably; its "AI Voice" did not reliably detect or switch between English and Spanish and did not transcribe Spanish calls at all; its ASR did not "never miss a word" but instead captured only fragments of recorded calls; its "omnichannel" integration with WhatsApp and other channels was unreliable; its implementation was neither "zero burden" nor completed "in days" but instead required repeated on-site troubleshooting and never achieved the represented functionality; and Connex's "dedicated client success team," as DK Law

experienced firsthand, was over its head and unable to resolve recurring, fundamental defects in the system. Connex's claim that "99% of [its] clients would recommend [Connex]" is further irreconcilable with the publicly documented, sustained customer complaints concerning non-functioning demos, crashed reporting dashboards, ignored termination notices, and invoicing after termination.

41.     DK Law is informed and believes that Connex has continued to make substantially the same representations on its websites and in its marketing materials after DK Law entered the relevant contract, with the purpose and effect of inducing other law firms, including other personal injury law firms, to enter into contracts with Connex on the same false basis. The continued publication of these representations is an ongoing deceptive business practice actionable under New York General Business Law § 349, as well as under California's Unfair Competition Law, and supports DK Law's prayer for injunctive relief.

### The Contract and Applicability of N.Y. Gen. Oblig. Law § 5-903

42.     In reliance on Connex's representations that its telecommunications services and software products could do everything that DK Law asked for and function as represented in the PowerPoint presentation, DK Law executed the Quotation Form and Master Terms (the "Contract") on October 9, 2024, with services commencing on October 8, 2024 for a one-year term.  A true and correct copy of the Contract is attached hereto as Exhibit 8.

43.     Pursuant to Paragraph 1 of the Master Terms, Connex agreed to provide DK Law with "Services" defined as "the provision of services by Connex (including the supply of Software) which may include Outbound Traffic Routing, Inbound Traffic Routing and outbound dialing to fixed and mobile telephone numbers, SMS, social media, and call recording as more particularly described in the Quotation Form . . . . ."  The software specified in the Quotation Form included Connex One Omnichannel System & Athena 2.0.

44.     Paragraph 15.1 of the Master Terms states that Contract "comes into effect on the Commencement Date and continues (i) for the Term and (ii) thereafter on a continuing basis of consecutive rolling periods the same length as the initial Term (each being a Renewal Term), the first such period immediately commencing following the initial Term, subject to termination in accordance with this clause . . . ."

45.     Paragraph 25 of the Master Terms provides that "[t]his [Contract] and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of the state of New York without regard to its conflict of laws provisions."

46.     New York General Obligations Law § 5-903 provides in pertinent part as follows:

(a) As used in this section, "person" means an individual, firm, company, partnership or corporation.

(b) No provision of a contract for service, maintenance or repair to or for any real or personal property which states that the term of the contract shall be deemed renewed for a specified additional period unless the person receiving the service, maintenance or repair gives notice to the person furnishing such contract service, maintenance or repair of his intention to terminate the contract at the expiration of such term, shall be enforceable against the person receiving the service, maintenance or repair, unless the person furnishing the service, maintenance or repair, at least fifteen days and not more than thirty days previous to the time specified for serving such notice upon him, shall give to the person receiving the service, maintenance or repair written notice, served personally or by certified mail, calling the attention of that person to the existence of such provision in the contract.

47.    The Contract is a contract for services to or for personal property within the meaning of New York General Obligations Law § 5-903. The Contract did not merely grant DK Law passive access to a website or database. It required Connex to provide an integrated telecommunications and software service, including the supply of software, outbound and inbound traffic routing, outbound dialing to fixed and mobile telephone numbers, SMS, social media communications, call recording, access to telephone numbers, and related configuration, implementation, support, and training services. As noted above, the Contract's own definitions describe "Services" as including "the provision of services by Connex (including the supply of Software) which may include Outbound Traffic Routing, Inbound Traffic Routing and outbound dialing to fixed and mobile telephone numbers, SMS, social media, and call recording," and further acknowledge telephone numbers, network infrastructure, customer network equipment, software, and associated property used in connection with the Services. The Contract therefore concerns services to or for personal property, including telecommunications numbers and systems, software, network equipment, and related communications infrastructure, and is the type of service contract to which § 5-903 applies.

48.    Paragraph 26 of the Master Terms provides that "New York shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual disputes or claims)." DK Law alleges that enforcement of the forum-selection clause, as distinct from the New York choice-of-law provision, would be unreasonable and inequitable under the circumstances alleged herein, including because the alleged misconduct, performance failures, non-renewal dispute, porting delays, and injuries occurred in California.

**Connex's Material Breaches, Performance Failures and Fraud**

49. The failures described below are relevant both because they constitute breaches of the Contract and because they demonstrate that the representations made to induce DK Law to enter the Contract were false or materially misleading when made.

50. Connex breached the Contract by failing, *inter alia*, to implement and deliver telecommunications and software services in a manner consistent with industry standards, and as was represented by Connex. Shortly after implementation, it became evident that Connex's professional services team on-site at DK Law, including but not limited to Steven Cortes and Richard Mealey, as well as customer service personnel located in the United Kingdom, were over their heads and did not have a thorough understanding of their own technology.

51. Although Connex assured DK Law that it was committed to ensuring that firm "operations continue without disruption," this proved untrue. The telephone system frequently went down in one or more of DK Law's offices, and it became routine for calls to get dropped or go unanswered, with no one at Connex being able to explain why this was happening or where the unanswered calls were going in the system. Defendant Connex tried to blame call dropping on offshore networking, but the problem was also experienced by DK personnel working in-office onshore and remotely. The Connex system also had a problem with Bluetooth connectivity, resulting in an extended period of silence at the beginning of calls. Calls were also consistently misrouted. For example, a call that was supposed to be sent to operations would instead be re-routed to reception. The same was true for live monitoring of calls. Sometimes DK Law had access, other times it did not.

52. DK Law's Intake Manager, Chief Technology Officer and others reported these problems to Connex's help support, which would intermittently send a summary of the problem back while at other times not respond at all. As the problems escalated, Connex sent Steven Cortes, Richard Mealey and others to

troubleshoot onsite with mixed results. Sometimes the problem was resolved for the moment, only to recur shortly thereafter, with no permanent fix.

53.     The Contract also included integration with WhatsApp. However, this functionality proved unreliable and effectively unusable, with DK Law receiving some messages but not others and calls being dropped.

54.     Another service that Connex contracted to provide to DK Law was call recording. Connex represented that its ASR would "never miss a word" of caller interactions with the AI software. This too was false. When DK Law's quality assurance managers checked recordings of calls, they would often discover that only a few seconds of a conversation was actually recorded despite the call record evidencing that the call was of longer length. And, in or about April and May 2025, DK Law could not access call recordings at all.

55.     Other functions that were supposedly included in the Athena software also did not work as promised. For example, AI Analytics was supposed to provide "effortless and rapid access to insights and reports" and "automated interaction summarization."  However, the AI assessment and automated features that DK Law were told were innate never worked. Instead, DK Law had to manually enter questions for the Athena software to score calls. Further, when Connex performed software upgrades, previously scored calls would show as new and need to be assessed again.

56.     Connex also represented in pre-contract discussions that its software was able to create real-time call transcripts of customer interactions conducted in English and Spanish. However, in reality, the Connex software only sometimes produced a transcript. When compared to the recorded conversations, DK Law found the transcripts of calls conducted in English to be inaccurate, and the Spanish language transcription did not work at all.

57.     Margarita Tejas, Quality Assurance Manager, and Eugenio Galban, Senior Quality Assurance Specialist, at DK Law reported these problems to

Brandon Kelly and Kiernan Panesar on Connex's tech support team and had weekly meetings with Gareth Hillary, a quality assurance specialist at Connex, but these problems were never resolved.

58.     Additionally, numerous features touted in the provided PowerPoint were never deployed nor were promised training workshops provided.

59.     These failures were not isolated, minor, or transitory. They were repeated, material, and central to the functionality that Connex had represented would be available and reliable for DK Law's use. Connex's inability to provide timely and effective remediation despite repeated reports supports the inference that one or more of the touted capabilities were not actually available as represented during the sales process.

### Nonrenewal of the Contract and Subsequent Harassment

60.     Ultimately, given the many problems with the Connex telephone system and software, on July 16, 2025, Brendan Haverlock, Chief Technology Officer, on behalf of DK Law, provided Connex with a Notice of Non-Renewal (the "Notice"). The Notice made clear that the Contract would not be renewed upon its expiration on October 7, 2025. Mr. Haverlock also pointed out in the Notice that Connex had failed to comply with New York General Obligations Law, Section 5-903. A true and correct copy of the Notice sent via email is attached hereto as Exhibit 9.

61.     Ignoring its noncompliance with Section 5-903 and claiming that it was inapplicable to the Contract, Connex advised DK Law that the Notice was untimely as it was required to be given no less than 90 days before the renewal date. Flouting the New York law, Connex then mounted an aggressive direct campaign demanding that DK Law capitulate to a one-year renewal.

62.     For example, Connex's Head of US Retention, Josh Woolf, began harassing Mr. Haverlock, repeatedly calling and texting him, offering unsolicited trips to company facilities and discounts, on the one hand, and threatening

litigation on the other.  Additionally, Mr. Mealey showed up uninvited to meet with Mr. Haverlock.  This did not stop until DK Law's counsel intervened and requested that the unwanted contact immediately stop.

### Connex's Unfair, Unlawful and Deceptive Business Practices

63.     DK Law is informed and believes that Connex has an unfair and deceptive business practice of promising customers a telephone system and AI software solution with functionality that does not exist or perform as represented.

64.     Additionally, after being advised of its failure to comply with Section 5-903 and receiving DK Law's notice of non-renewal, Connex engaged in an unfair business practice by continuing to invoice DK Law after the end of the contract term, demanding payment that it was not entitled to and threatening to send any unpaid invoices to collections.

65.     Beginning on or about September 22, 2025, Patrick Mcilvaine, Manager of CCaaS, and Hugo Doan, Sr. Developer, Corporate System, at DK Law reached out to Connex to get a PIN needed to port DK Law's telephone numbers to another provider. Mr. Mcilvaine and Mr. Doan's requests for the PIN were ignored in violation of the Communications Act and FCC Rules. DK Law turned to Twilio, the carrier which owns the telephone numbers that were provisioned to Connex, for help. On information and belief, Connex was also unresponsive to Twilio's communications, delaying the porting of numbers to a new provider until on or after October 6, 2025.

66.     DK Law is informed and believes that it is not alone in experiencing unprofessional and harassing behavior, wrongful billing and collection threats, and uncooperative behavior in porting telephone numbers after providing notice of non-renewal to Connex. Likewise, DK Law is informed and believes that Connex's failure to comply with Section 5-903 is ubiquitous and widespread, which suggests that the behavior emanates from and has the approval of, the

COMPLAINT

CASE NO. 8:26-cv-01021

highest echelons of Connex's management in England, Delaware and elsewhere.

67.     With their unfair and deceptive business practices, breaches of contract, and other torts, Defendants and each of them, have intentionally, and without justification, caused damage to DK Law as described herein.

68.     DK Law seeks restitution and disgorgement of the monies improperly paid to Connex for its telephone and software services and the related Contract, which Contract DK Law was induced to enter into by Connex's material misrepresentations and fraud. In addition to restitution, DK Law seeks to recover its other damages, including attorneys' fees, in an amount to be proven at trial, but totaling in the millions of dollars. DK Law also seeks an increase in the award of damages to an amount not exceeding three times actual damages up to the specified limit and attorneys' fees for its claim under New York General Business Law § 349. Finally, DK Law seeks an injunction to stop Connex from the deceptive acts and practices and unlawful conduct described herein and to protect and prevent other Connex customers from being similarly defrauded by Connex. Connex's actions were willful and unlawful and subject Connex to exemplary damages as well.

69.     DK Law pleads its fraud and negligent misrepresentation claims under California law and, in the alternative, under New York law. DK Law also pleads its California statutory claims under California Business and Professions Code §§ 17200 and 17500 because the deceptive and false-advertising conduct was directed to DK Law in California and caused injury in California. In the alternative, DK Law pleads its New York General Business Law § 349 claim based on the same deceptive conduct to the extent New York law applies. DK Law separately alleges that New York law governs the Contract, including the interpretation and enforceability of the automatic-renewal provision, DK Law's breach-of-contract and implied-covenant claims, and DK Law's request for declaratory relief under New York General Obligations Law § 5-903.

## **FIRST CAUSE OF ACTION**
### **(Fraud in the Inducement and Promissory Fraud)**
### **(Against All Defendants)**

70.     DK Law realleges and incorporates herein by reference paragraphs 1-69, inclusive, as though set forth in full in this First Cause of Action.

71.     The misrepresentations made by Connex include at least the following statements contained in the PowerPoint presentation (Exhibit 1) and sent to DK Law's representative on or about September 30, 2024, discussed with Ms. Axalan on or about October 3, 2024 and made on Connex's public website during the weeks and months leading up to DK Law's execution of the Contract (Exhibits 2-7):

- Connex's "inhouse team are on hand 24/7 whenever you need them" "ensuring that . . . operations continue without disruption."

- Connex had the experience and the software was currently developed so that all of the features of the Omnichannel System and Athena software could be configured to meet DK Law's needs within a week and would integrate seamlessly with existing systems, including phone and voice services, inbound and outbound communication, webforms, live chat, email, social media, SMS & WhatsApp, API logging and integration, PCI DSS/payment IVR, sentiment analysis, entity recognition, call transcripts, whisper coaching, interaction clustering, training cues, ability to identify trends and Athena flows.

- Athena's AI Agent would work for DK Law out of the box, offering 24/7 availability; faster response times and personalized interactions, boosting customer satisfaction; human-like voice and text-based communication, scalable and capable of handling 50x more interactions using a trained model without compromising on quality or

COMPLAINT                                                    CASE NO. 8:26-cv-01021

response times; cost efficiency; automation of repetitive and routine tasks, such as authentication, appointment booking, payment processing, FAQ responses, etc. with 24/7 support; enhanced compliance with regulatory disclosures and compliance requirements; delivery of a consistent and standardized experience to every customer, ensuring that all enquiries are handled with the same level of accuracy and professionalism; and optimization of interaction management.

- Athena's AI Guru provided "Dynamic Guidance in Real-Time," which was real-time call transcripts of customer interactions in English and Spanish, "facilitating swift analysis and issue resolution."

- Athena's AI Analytics component functionality out of the box would provide DK Law with "rapid access to insights and reports."

- Connex's ASR would "never miss a word" of caller interactions with the AI software, and calls would be routed to the correct person or department at DK Law.

- Connex's platform and software fully integrated with WhatsApp.

- Connex's platform would deliver a "133% Increase in workforce productivity," a "60% Average increase in sales," "99% Of our clients would recommend us," and a "36% Increase in CSAT scores".

- Connex's Athena AI was "The Leading Conversational LLM — the cutting-edge generative AI solution transforming customer interactions with seamless, conversational intelligence across voice and digital channels".

- Connex's Flow workflow automation would enable DK Law to "orchestrate comprehensive omnichannel customer journeys" with rules to "automate the entire process".

72. The representations and promises made by Connex as alleged herein

were false and were known to be false or made with reckless disregard when made to DK Law, as Defendants knew that their software did not include the native functionality represented and that they could not provide such functionality out of the box or successfully implement and customize such a telephone and AI system that met all of DK Law's requirements with the functionality and within the timeframe promised.  Yet Connex, through its authorized agents, represented that it possessed such telephone services and AI solutions functionality and that it currently existed and could be further customized to meet DK Law's specific needs and implemented within a one-week period of time. The representations and promises that were made by Connex were false and material. In reality, Connex knew when it made the promises that it could not deliver the reliability and functionality that it pitched to land the deal with DK Law and induce the Contract.

73.    Upon information and belief, Connex knew or was reckless in not knowing, at the time of the pre-contract representations, that one or more of the represented functionalities did not in fact exist in the manner represented, were not then deployable for DK Law's use case, or could not be configured and implemented within the promised timeframe.  The breadth and persistence of the failures following implementation support the inference that Connex's representations concerned capabilities it knew were absent, materially incomplete, or not ready for deployment as represented.

74.    DK Law reasonably relied on the representations and promises made by Connex all to DK Law's detriment and injury. DK Law's reliance on Connex's misrepresentations were justifiable in that Plaintiff had no reason to doubt the truthfulness of Defendants' representations concerning the attributes of their telephone and software solutions because Connex had repeatedly touted their experience with similar solutions for customers similarly situated to DK Law. In addition, Connex as a company in the telecommunications and AI software solution space is presumed to know the products of its competitors, and when it

represents that its product has even better functionality, then it is reasonable for prospective customers such as DK Law to rely on Connex's superior knowledge of their services and software.  Based on Connex's superior knowledge of their telephone services and AI software and its ability to customize, configure, and implement these services and software for DK Law's specific needs and uses, DK Law justifiably relied upon Connex's representations by entering into the Contract.

75.    DK Law would not have entered into the Contract with Connex had it known that the telephone services and software solution could not perform as Connex represented and that it would be less reliable than the telephone platform that DK Law was using at the time of contracting with Connex.

76.    As a result of Connex's fraud in the inducement and promissory fraud, DK Law is entitled to an award of damages, including but not limited to the cost of disruptions and unrealized efficiencies in converting contacts into new clients, as well as loss of resources, revenue and profits due to deficiencies in the Connex system; loss of process improvements; and additional labor and other costs and damages in an amount to be proven at trial.

77.    As a result of Connex's fraud in the inducement and promissory fraud, DK Law is entitled to damages, restitution, rescission, and other damages to the extent permitted by law.

78.    DK Law seeks punitive damages under California law on its fraud-based claims because Defendants knowingly or recklessly misrepresented existing platform capabilities, implementation readiness, support, and performance metrics to induce DK Law to enter the Contract, while concealing that the promised functionality did not exist, was materially incomplete, or was not deployable for DK Law's use case as represented. Defendants' conduct, if proven, constitutes fraud, malice, or oppression within the meaning of California Civil Code § 3294.

79.    Alternatively, under New York law, DK Law is entitled to punitive

damages as a result of Connex's fraudulent conduct, because Defendants' conduct was willful, morally culpable, and not limited to a private contract dispute. As alleged above, Defendants used standardized sales materials, public marketing representations, and recurring renewal practices directed to a broad segment of prospective customers, including law firms and other businesses. DK Law therefore seeks punitive damages on its fraud-based claims because Defendants' conduct, if proven, constitutes the type of gross, publicly directed misconduct and wanton dishonesty for which punitive damages are available under New York law.

## SECOND CAUSE OF ACTION
### (Negligent Misrepresentation)
### (Against All Defendants)

80.    DK Law realleges and incorporates herein by reference paragraphs 1-79, inclusive, as though set forth in full in this Second Cause of Action.

81.    Before the Contract was executed, Defendants did not act merely as an ordinary vendor marketing a commodity product. Rather, Defendants undertook to assess DK Law's communications and intake needs, solicited detailed information about DK Law's operational needs, communications workflow, intake requirements, and desired integrations, represented that they were evaluating those needs for the purpose of recommending and implementing a tailored solution, and held themselves out as having specialized expertise regarding the selection and configuration of AI-driven contact-center platforms for personal injury law firms. In doing so, Defendants stood in a special or privity-like relationship with DK Law sufficient to impose a duty to impart correct information.

82.    Defendants, through their authorized agents, represented to DK Law that they possessed and could customize and implement telephone services and an AI solution with the promised capabilities and functionality to meet DK Law's

COMPLAINT                                                           CASE NO. 8:26-cv-01021

26

express requirements, and to do so within one week of contract execution. The representations and promises that were made by Connex were false and material and are set forth in detail in the bullet points of paragraph 71 above. In reality, Connex's telephone services and AI software did not possess the reliability and functionality represented by Connex and took months for even an initial flawed configuration, and Connex knew or should have known that they could not deliver the services that were promised to DK Law.

83.     Defendants owed Plaintiff a duty of care to communicate accurate information about the capabilities of the telephone services and AI software it was selling. This duty arose from (a) Defendants' status as a commercial supplier of specialized telecommunications technology with superior expertise in its own products; (b) Defendants' knowledge that Plaintiff would rely on Defendants' representations in deciding whether to purchase the system; (c) Defendants' specific intent that Plaintiff rely on the representations; (d) the transaction being specifically directed at and tailored to Plaintiff's particular business needs as a personal injury law practice; and (e) Defendants' voluntary undertaking to evaluate DK Law's needs and recommend a suitable telecommunications and AI solution.

84.     At the time Connex made these representations to DK Law, it knew, or in the exercise of reasonable care, should have known, that it did not possess those capabilities, making its representations false. Connex made the representations for the express purpose of inducing DK Law to enter into the Contract.

85.     Based on Connex's superior knowledge of its telephone services and software and its ability to customize, configure, and implement these services for DK Law's specific needs and uses, DK Law, which had no actual knowledge of Connex's capabilities, justifiably relied upon Connex's representations in entering into the Contract. DK Law justifiably and reasonably relied on Connex's

representations and promises to its detriment and injury. This reliance was reasonable in light of Connex's professed knowledge of Connex's capabilities and DK Law's requirements.

86.    DK Law would not have entered into the Contract with Connex had it known that the representations and promises were not true.

87.    As a consequence of the false representations and promises of Connex, DK Law has been damaged including but not limited to the cost of disruptions and unrealized efficiencies in converting contacts into new clients, as well as loss of resources, revenue and profits due to deficiencies in the Connex system; loss of process improvements; and additional labor and other costs and damages in an amount to be proven at trial.

88.    As a result of Connex's negligent misrepresentation, DK Law seeks damages, restitution, rescission, and other damages to the extent permitted by law.

### THIRD CAUSE OF ACTION
### (Breach of Contract)
### (Against All Defendants)

89.    DK Law realleges and incorporates herein by reference Paragraphs 1-88, inclusive, as though set forth in full in this Third Cause of Action.

90.    DK Law and Connex executed the Contract under which Connex COI agreed to provide DK Law with "Services" defined as "the provision of services by Connex (including the supply of Software) which may include Outbound Traffic Routing, Inbound Traffic Routing and outbound dialing to fixed and mobile telephone numbers, SMS, social media, and call recording as more particularly described in the Quotation Form . . . . ." The software specified in the Quotation Form included Connex One Omnichannel System & Athena 2.0, which included AI Agent, AI Guru, AI Analytics, AI Voice and ASR.

91.    To the extent CO Ltd. and Does 1-50 contend they are not a party to the Contract, DK Law alleges in the alternative that CO Ltd. and Does 1-50 are

liable for COI's contractual obligations under agency, ratification, instrumentality, or alter-ego principles because they directed, controlled, ratified, and benefited from the contractual, implementation, support, renewal-enforcement, billing, and number-porting conduct alleged herein.

92. DK Law performed all, or significantly all, of the things required of it, or was excused from performing due to Defendants' breaches and other misconduct.

93. Connex failed to deliver the telephone and AI software services with the required features that it was obligated to provide, thereby breaching the Contract. The breaches were material and went to the heart of what was promised. Connex also failed to implement and deliver telecommunications and software services in a manner consistent with industry standards, and as was represented. Instead, DK Law experienced its telephone system frequently going down and calls being dropped or going unanswered, with no one at Connex being able to explain why this was happening or where the unanswered calls were going in the system, Bluetooth connectivity problems, misrouted calls, inability to access live monitoring of calls, unreliable WhatsApp integration, incomplete call recordings, inaccurate or missing transcriptions and nonfunctioning AI assessment and automated features. All of these failures materially impeded DK Law's ability to use the services that it bought and paid for.

94. As a result of Defendants' breaches, DK Law has been damaged and harmed in an amount to be proven at trial.

95. To the extent Connex relies on any limitation-of-liability, damages-exclusion, or liability-cap provision, DK Law alleges that such provisions do not limit recovery for fraud, fraudulent inducement, intentional misconduct, willful misconduct, or grossly negligent conduct, and are otherwise unenforceable to the extent their enforcement would shield Connex from liability for the misconduct alleged herein.

## FOURTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith & Fair Dealing)
### (Against All Defendants)

96.     DK Law realleges and incorporates herein by reference Paragraphs 1-95, inclusive, as though set forth in full in this Fourth Cause of Action.

97.     DK Law and Connex entered into the Contract. There is and was implied in this agreement a covenant of good faith and fair dealing by which Connex assumed a duty to fully perform its contractual obligations and impliedly covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff fairly and honestly and do nothing to impair, interfere with, hinder or potentially injure the rights of Plaintiff to receive the benefits of the aforementioned contract.

98.     To the extent CO Ltd. and Does 1-50 contend they are not a party to the Contract, DK Law alleges in the alternative that CO Ltd. and Does 1-50 are liable for COI's contractual obligations under agency, ratification, instrumentality, or alter-ego principles because they directed, controlled, ratified, and benefited from the contractual, implementation, support, renewal-enforcement, billing, and number-porting conduct alleged herein.

99.     Connex has breached the implied covenant of good faith and fair dealing owed to Plaintiff by their actions herein above alleged with the intent to deprive Plaintiff of its rights under the Contract. Connex has acted in bad faith by continuing to make promises and other representations to Plaintiff after contract execution about the capabilities of its telephone services and AI software, which it knew were false. In addition, Connex violated the covenant by failing to provide DK Law with an automatic renewal notice as required by New York General Obligations Law § 5-903, and then threatening and actually bringing collection litigation when it had no contractual basis for doing so.

100.   Further, after DK Law exercised its right to provide notice of

nonrenewal and sought to transition away from the Connex platform, Connex engaged in conduct that frustrated DK Law's ability to receive the benefit of the bargain and to exit the relationship at the end of the initial term, including obstructive retention efforts, unreasonable delay or refusal in facilitating transition-related cooperation in completing DK Law's number porting request, and conduct designed to pressure DK Law into a renewal notwithstanding the parties' dispute over the enforceability of the automatic-renewal provision.

101.   Connex breached the implied covenant by using its control over renewal enforcement, billing, collections, transition cooperation, and number-porting processes in a manner calculated to deprive DK Law of the benefit of the Contract and to prevent DK Law from exiting the relationship at the end of the initial term. This conduct was separate from Connex's initial failure to deliver promised functionality and included post-nonrenewal conduct designed to pressure DK Law into paying for an unenforceable renewal term.

102.   DK Law is informed and believes that Connex's actions were not prompted by an honest mistake, or bad judgment, or even negligence, and were not a simple breach of contract. Instead, they were caused by conscious and deliberate acts whereby Connex sought to increase its profits at DK Law's expense, strong arm DK Law into an unwanted renewal and delay DK Law's ability to switch to another provider.

103.   Plaintiff has performed all of its obligations under the Contract, including working and collaborating with Connex in good faith and paying all payments owed under the Contract. In addition, all conditions for Defendants' performance occurred. By their actions and misrepresentations described above Connex prevented DK Law from gaining the benefits of the contract that it had bought and paid for.

104.   As a direct and proximate result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount

to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Violation of N.Y. Gen. Bus. Law § 349)
### (Against All Defendants)

105.    DK Law realleges and incorporates herein by reference paragraphs 1-104, inclusive, as though set forth in full in this Fifth Cause of Action.

106.    Defendants have committed, and on information and belief continue to commit, certain deceptive acts and practices that actually harmed Plaintiff, and those in the general public similarly situated to Plaintiff, and there is no adequate remedy at law. Defendants' deceptive conduct was consumer-oriented and had the capacity to affect numerous similarly situated customers because the challenged practices were not unique to DK Law, but instead arose from standardized sales materials, recurring representations about core platform capabilities, and standardized renewal-enforcement tactics used in the marketing and attempted renewal of Defendants' services.  Defendants' actionable deceptive acts and practices are already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein.

107.    Plaintiff has alleged that Connex has committed fraud in the inducement and negligent misrepresentation based on its pre-contractual misrepresentations, which are set forth in detail above and incorporated here by reference. DK Law has also alleged that Connex has violated New York General Obligations Law § 5-903 by failing to give timely written notice, served personally or by certified mail, calling attention to the purported automatic renewal provision in the Contract. By failing to do so, Connex rendered the contractual renewal provision unenforceable. Yet, Connex deceptively tried to strong arm DK Law into an unwanted renewal, threatening litigation if it refused to capitulate, and then actually bringing litigation. Connex further violated provisions of the Communications Act and FCC rules by refusing to facilitate and

complete DK Law's number porting request without unreasonable delay.

108.   Defendants' acts and practices were deceptive in a material way because they were likely to mislead a reasonable customer concerning the nature, capabilities, readiness, and renewal consequences of the offered platform and contractual relationship. DK Law was injured by reason of those deceptive acts and practices when it entered into and paid under a contractual relationship induced by materially misleading statements and then incurred additional costs and disruption when Defendants attempted to enforce a purported renewal that DK Law contends was unenforceable.

109.   As a result of Defendants' deceptive acts and practices, DK Law was injured by entering into and paying under a contractual relationship induced by materially misleading statements concerning the nature, capabilities, and readiness of the offered platform, and by incurring additional costs and disruption when Defendants attempted to enforce a purported renewal that was unenforceable.

110.   There is no adequate remedy at law, and an injunction should be issued to prevent Connex from engaging in such deceptive acts and practices in the future. Money damages are not sufficient to compensate DK Law for the harm caused by Connex's deceptive acts and practices, and the public must be protected from future acts, through injunctive relief.

111.   Pursuant to New York General Business Law § 349(h), Plaintiff seeks actual damages or the statutory minimum, whichever is greater, reasonable attorneys' fees and costs, such discretionary enhancement of damages as the statute permits, and injunctive relief prohibiting Defendants from continuing the deceptive acts and practices alleged herein.

## SIXTH CAUSE OF ACTION
### (Violation of Business & Professions Code § 17200 *et seq.*)
### (Against All Defendants)

112.   DK Law realleges and incorporates herein by reference paragraphs 1-

111, inclusive, as though set forth in full in this Sixth Cause of Action.

113. DK Law pleads its California statutory claims in the alternative under Federal Rule Civil Procedure 8(d)(2). To the extent the Court concludes that New York General Business Law § 349 does not provide relief for deceptive conduct directed at DK Law in California, DK Law alleges in the alternative that the same conduct violates California Business and Professions Code §§ 17200 and 17500.

114. Defendants, and each of them, have committed, and on information and belief continue to commit, certain business acts and practices that actually harmed DK Law, and those in the general public similarly situated to DK Law, and there is no adequate remedy at law. Those actionable and unfair business acts and practices are already alleged with factual particularity above, and those allegations are incorporated by reference as though set forth fully herein. The hereinabove allegations of business acts and practices become actionable under California's Unfair Competition Law in conjunction with the following additional allegations.

115. Such business acts and practices are "unlawful" in that they are forbidden by law. DK Law has alleged that Connex has committed fraud in the inducement and negligent misrepresentation based on its pre-contractual misrepresentations, which are set forth in detail above and incorporated here by reference. DK Law has also alleged that Connex has violated New York General Obligations Law § 5-903 and provisions of the Communications Act and FCC rules. There is no adequate remedy at law, and an injunction should issue to prevent Defendants from participating in such unlawful conduct in the future. Money damages are not sufficient to compensate DK Law for the harm caused by Defendants' unlawful conduct, and the public must be protected from future acts, through injunctive relief.

116. Defendants' conduct is "unfair" under Business and Professions Code § 17200. First, Defendants' conduct is tethered to legislatively declared policies

prohibiting deceptive commercial practices, false advertising, unlawful automatic-renewal enforcement, and unreasonable obstruction of telephone-number porting. Defendants allegedly obtained and retained business through materially false capability representations and through renewal practices that DK Law contends violate New York General Obligations Law § 5-903, allowing Defendants to capture and retain customers through practices that honest competitors in the contact-center-software market could not lawfully or fairly employ. Second, Defendants' conduct caused substantial injury to DK Law and similarly situated customers that was not reasonably avoidable because the misrepresentations concerned Defendants' own platform capabilities, implementation readiness, and renewal practices — matters customers could not reasonably verify before purchase or renewal. That injury is not outweighed by any countervailing benefit to customers or competition. No statute, regulation, or other authority permits, authorizes, or safely harbors Defendants' alleged conduct.

117.   Such business acts and practices are "fraudulent" in that they did mislead DK Law and are likely to mislead members of the general public that are Defendants' customers or potential customers. At all relevant times, DK Law relied on Defendants' misrepresentations, misleading statements, functionality demonstrations and other conduct, such as their assertions that they could deliver a working, integrated telephone and AI system with certain features within a certain period of time, and those in the general public similarly situated will likely also rely on the same fraudulent and material misrepresentations in the future, and there is no adequate remedy at law and an injunction should issue to prevent similar conduct by Connex in the future, and to protect prospective Connex customers, competitors of Connex and the public in general.

118.   Because such business acts and practices are unlawful, unfair, and fraudulent, and there is no adequate remedy at law, they violate Business & Professions Code §§ 17200, et seq., and are actionable by DK Law for injunctive

relief and restitution in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Violation of Business & Professions Code § 17500 *et seq.*)
### (Against All Defendants)

119.   DK Law realleges and incorporates herein by reference paragraphs 1-118, inclusive, as though set forth in full in this Seventh Cause of Action.

120.   California Business and Professions Code section 17500 prohibits any person or corporation, with intent directly or indirectly to dispose of real or personal property or to perform services, from making or disseminating any statement concerning that property or those services that is untrue or misleading and that is likely to deceive members of the public.

121.   Defendants, and each of them, made and disseminated advertising and promotional statements to the public and to prospective customers, including DK Law, through, among other channels: (a) Defendants' public-facing websites and marketing pages (including archived captures attached hereto as exhibits); and (b) Defendants' marketing materials and sales presentations used to promote Connex's telephone services and AI software.

122.   Defendants' advertising and promotional statements included, without limitation, representations that Connex's telephone services and software: (a) provided 24/7 support and would minimize downtime and disruption; (b) included native omnichannel and Athena AI features (including WhatsApp integration, call routing, recording, transcription, sentiment analysis, entity recognition, and analytics/reporting) that could be configured to meet DK Law's needs within a week; (c) provided Automatic Speech Recognition that would never miss a word; and (d) achieved specific numerical performance metrics (including 133% increase in workforce productivity 60% average increase in sales 99% of our clients would recommend us and 36% increase in CSAT scores).

123.   As alleged herein, these statements were untrue and/or misleading at

the time they were made and disseminated, including because DK Law experienced, among other things, months-long configuration delays, recurring outages, dropped and misrouted calls, unreliable WhatsApp integration, incomplete call recordings and periods of inaccessible recordings, inaccurate English transcription, and nonfunctional Spanish transcription, and nonfunctioning AI analytics and automated reporting features.

124.   Defendants' statements were likely to deceive reasonable consumers and members of the public because they conveyed specific, factual claims about Defendants' existing capabilities, reliability, implementation timeline, and performance outcomes that would be material to a prospective customer's decision to purchase Connex's services.

125.   Plaintiff is not required to plead or prove actual deception to state a claim under section 17500; it is sufficient that Defendants' advertising and promotional practices were likely to deceive members of the public.

126.   Plaintiff suffered injury in fact and lost money or property as a result of Defendants' false and misleading advertising and promotional practices, including by entering into and paying monies under the Contract in reliance on Defendants' representations.

127.   DK Law is informed and believes that absent injunctive relief, Defendants will continue to disseminate the same false and misleading advertising to prospective customers in California, including California law firms and California personal-injury firms specifically targeted by Defendants' published "Optimizing Legal Intake" materials. DK Law has no adequate legal remedy for this ongoing prospective deception of third parties, which legal damages awarded to DK Law cannot prevent.

128.   Plaintiff seeks equitable relief, including injunctive relief prohibiting Defendants from continuing to disseminate the false and misleading advertising and promotional statements alleged herein, and restitution of monies acquired by

means of such unfair advertising.

129.   Plaintiff seeks such other relief as the Court deems proper consistent with the equitable remedies available for false advertising and unfair competition claims.

## EIGHTH CAUSE OF ACTION
### (Declaratory Relief)
### (Against All Defendants)

130.   DK Law realleges and incorporates herein by reference paragraphs 1-129, inclusive, as though set forth in full in this Eighth Cause of Action.

131.   DK Law contends that Connex failed to comply with New York General Obligations Law § 5-903, that the automatic-renewal provision is unenforceable, that the Contract expired at the end of the initial term, and that DK Law owes no post-expiration renewal charges. Defendants dispute those contentions and have asserted that the Contract renewed for an additional term and that DK Law owes post-expiration charges. A present and actual controversy therefore exists.

132.   Resolution of the parties' respective rights and duties under this contractual provision and a determination as to the applicability of Section 5-903 are necessary, and there exists no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for damages and other relief against Defendants, and each of them, as follows:

A.   Rescission of the Contract due to Connex's fraud in the inducement and negligent misrepresentations and returning DK Law and Defendants to the position that they were in pre-contract, and restoring all payments made by Plaintiff to Defendants;

B.   A declaratory judgment that Connex failed to comply with New York General Obligations Law § 5-903, that the automatic-renewal

provision is unenforceable, and that the Contract did not renew after the initial term;

C. A preliminary and permanent injunction against Defendants, their servants, employees, attorneys and all other persons in active concert or participation with Defendants prohibiting Defendants from continuing to engage in the deceptive, false-advertising, renewal-enforcement, billing, collection, and transition-related practices alleged herein;

D. For general and other damages, including but not limited to the cost of disruptions and unrealized efficiencies in converting contacts into new clients, as well as loss of resources, revenue and profits due to deficiencies in the Connex system; loss of process improvements; and additional labor and other costs and damages in an amount to be proven at trial;

E. For an increase in the award of damages to an amount not exceeding three times actual damages, up to the statutory limit pursuant to New York General Business Law § 349(h);

F. For any and all injunctive relief, equitable relief and restitution authorized by Cal. Bus. & Prof. Code § 17200 and 17500, et seq.;

G. For a declaration of the rights and obligations of the parties as to the enforceability of the automatic renewal provision in the Contract, to the extent the Contract is not rescinded or terminated;

H. For punitive damages on DK Law's fraud-based claims and any other claims for which punitive damages are legally available;

I. For restitution;

J. For attorneys' fees and costs to the extent authorized by statute, contract, or other applicable law;

K. For prejudgment interest; and

L. For such other and further relief, as may be appropriate.

## JURY DEMAND

DK Law requests a jury trial on all issues so triable.


DATED: April 30, 2026          TACTICAL LAW GROUP LLP



By:  /s/ Dee A. Ware
Dee A. Ware
Attorneys for Plaintiff Attorneys for
Plaintiff DK LAW – INJURY, ACCIDENT
AND MORE, PC f/k/a THE LAW
OFFICES OF DANIEL
KIM, CORPORATION